# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**LISA M. TORRES,**
        **Plaintiff,**

v.                                                Case No. 09-C-1095

**WEIGEL BROADCASTING COMPANY,**
        **Defendant.**

---

## DECISION AND ORDER

Plaintiff Lisa M. Torres has filed this suit under the Americans with Disabilities Act ("ADA") against her former employer, Weigel Broadcasting Company. She claims that Weigel discriminated against her because of her alleged disability—anxiety disorder—and retaliated against her for complaining about disability discrimination. Weigel has moved for summary judgment on these claims. See Fed. R. Civ. P. 56.

## I. BACKGROUND

The following facts are stated as favorably to plaintiff as the record allows.

Weigel is a television broadcasting company that has a news station in Milwaukee. In March 2007, Weigel hired plaintiff as a part-time member of the production crew. The production crew is responsible for operating certain equipment during news broadcasts, including cameras, teleprompters, and audio equipment. Plaintiff's immediate supervisor was Bryan Hughes.

At the time she was hired, plaintiff had no previous experience on a production crew. Weigel put her on a 90-day probationary period, and during the first 60 days of this period she performed poorly. In fact, her performance was so poor that a director, Brian Sikorski,

recommended that she be terminated. Because of these performance issues, Hughes decided to meet with plaintiff prior to the expiration of her probationary period. This meeting occurred on May 31, 2007. Cheryl Lenzo, Hughes's supervisor, and Christina Camps, the human-resources manager, also attended. During the meeting, Hughes informed plaintiff of a number of deficiencies in her performance, including issues relating to her handling of the camera. He also verbally reprimanded her in connection with an incident in which she had abandoned her camera during a live broadcast without informing anyone. Plaintiff explained that this incident occurred because she suddenly felt sick and had to go to the bathroom. Hughes said that he understood that sudden illnesses might occur, but he told her that she must inform the director before leaving her post so that the director did not switch the shot to her camera during her absence. Plaintiff said she understood and that she would tell someone if a situation like that occurred in the future. At the conclusion of the meeting, plaintiff was informed that her probationary period would be extended beyond 90 days and that Hughes would develop a written list of areas that needed improvement.

At some point in the summer of 2007, plaintiff informed Hughes that she had anxiety and depression issues, and that, "workwise," she would get nervous easily. (Torres Dep. [Docket #31-1] at 53–54.) Shortly thereafter, plaintiff had a conversation with Hughes and Camps in which they asked her about her anxiety issues. (Id. at 57–58.) Around the same time, plaintiff was hospitalized for one day for reasons relating to her anxiety. Plaintiff called Hughes from the hospital emergency room and informed him that she was at the hospital and would not be able to report for work because she was being taken to the Milwaukee County Health Complex. Plaintiff states that she told Hughes that the

hospitalization was related to her anxiety. (Id. at 232.) Hughes told plaintiff not to worry about missing work and that he would cover her shift.

In September 2007, during a live Muscular Dystrophy Association Telethon, plaintiff became nervous and began to cry while performing her duties. Hughes noticed this, approached plaintiff, and told her that she was doing a good job and needed to relax. Plaintiff then went to the bathroom to calm herself down. Plaintiff states that similar incidents—in which she became nervous during broadcasts and had to go to the bathroom to calm down—occurred about three or four other times during the course of her employment at Weigel.

In January 2008, a full-time position became available on the production crew. In order to become a full-time member of the production crew, plaintiff had to be trained to run audio equipment during a broadcast. When plaintiff asked Hughes whether she could be trained to run the audio equipment, he told her that it was not the right time for her to receive that training. Hughes thought that because plaintiff was having difficulty performing her existing duties, giving her additional responsibilities would not be a good idea. His decision to not provide her with additional training was based in part on his observation that she was having emotional and anxiety issues while at work. Hughes advised plaintiff that he did not want to take her out of her "comfort zone" by giving her additional responsibilities. (Hughes Decl. [Docket #31-2] ¶ 24.)

Plaintiff's grandmother passed away on February 24, 2008, and plaintiff took three days of funeral leave along with one personal day. Plaintiff was scheduled to return to work on Sunday, March 2. However, on the evening of Saturday, March 1, plaintiff approached Hughes after hours at a co-worker's going-away party and informed him that

3

she needed a second personal day and would not be able to work on Sunday. Hughes was upset, but he told her that he would cover her shift. However, when preparing the schedule for the following two weeks, Hughes reduced plaintiff's hours to only three shifts over the two-week period. Plaintiff was upset with this reduction in her hours and decided to complain to Lenzo. On March 16, 2008, plaintiff left the following voicemail message for Lenzo:

> Hi, Cheryl, this is Lisa Torres calling. Um, I just got some new information just recently that I'm only going to be scheduled one day for the following week and I really seriously need to talk with you about this matter as soon as possible—possibly tomorrow morning or sometime during the week—whenever you're available. I just . . . I really need to solve this because this is just . . . this disgusts me and I don't know why Bryan Hughes is um scheduling me only for one day. I've never . . . this whole year, I've never gotten scheduled only one day. And all the new people are getting a lot of hours and I'm singled out. I'm the only one that's getting two days a week or one day a week. I don't know why he's doing this. I have a feeling he's doing this on purpose and is very discriminatory and I would like to have this solved immediately because I just . . . I can't go on like this; I cannot . . . it's not enough money to even pay all my bills. What am I supposed to do? You know. This isn't McDonalds; this is a TV station. So, if you can, please give me a call.

(Def.'s Ex. 18 [Docket #31-8 at p. 48].) On March 17, 2008, plaintiff left another voicemail message for Lenzo about being scheduled for only three shifts. In this message, plaintiff stated that she believed that Hughes had discriminated against her by cutting her shifts and that she would "probably have to contact the Department of Workforce Development" if her hours weren't given back. (Resp. to Interrogatory No. 60 [Docket #39-3 at pp. 16–17].) Plaintiff did not say anything in these voicemails about being discriminated against on the basis of disability, and her reference to the Department of Workforce Development was a reference to filing a claim for partial unemployment benefits based on the reduction in her hours. (Torres Dep. [Docket #31-1] at 197–98.) In response to

4

plaintiff's complaints, Lenzo talked to Hughes and told him to schedule plaintiff to work at least three shifts every week. Hughes complied.

In an internal memorandum drafted shortly after plaintiff made her claim for unemployment benefits, Camps provided someone named Barbara with an overview of plaintiff's employment at Weigel. At the end of the memorandum, Camps stated that plaintiff "has emotional outbursts and appears at times to be very unstable." (Def.'s Ex. 6 [Docket #31-8 at p. 14].)

On March 31, 2008, plaintiff was assigned to operate a camera during the Telemundo broadcast. The Telemundo broadcast is a thirty-minute news program that is recorded between 7:00 p.m. and 8:00 p.m. for airing at 10:00 p.m. the same evening. Although the broadcast is recorded for airing at a later time, it is recorded "live to tape." This means that Weigel conducts and records the newscast in a single, continuous, 30-minute segment rather than in multiple segments that are spliced together for later playback. Although most of this 30-minute segment is recorded live in the studio, there is a six-to-nine-minute national news segment that is played from an out-of-state feed. While the national news segment is playing, the camera operators in the studio are not recording anything. Generally, however, the camera operators are on standby in case technical difficulties arise in connection with the out-of-state feed and the local portion of the broadcast must resume. However, it was customary for the director of the Telemundo broadcast to inform the camera operators that they could take a break during the national news segment.

On March 31, while the national news segment was playing, plaintiff left her camera and entered the control room without notifying the director or without anyone else giving

5

her permission to do so. A short time later, plaintiff returned to her camera. After observing plaintiff's actions, Hughes went to the control room and asked Sikorski (the director) whether plaintiff had been given permission to leave her camera. Sikorski said no. Because Hughes had previously warned plaintiff about leaving her camera without permission, he decided to inform Lenzo and Camps about this infraction. A day or two later, Hughes, Lenzo and Camps met to discuss the issue, and they made a preliminary decision to terminate plaintiff's employment unless she was able to provide a satisfactory explanation for leaving her camera without permission.

On April 3, 2008, Hughes asked plaintiff to come to the human-resources office. Plaintiff said that she would come, but she did not follow Hughes to the office. After waiting ten minutes, Hughes learned from a co-worker that plaintiff had said that she was not feeling well and that she had gone to the bathroom. After waiting another five minutes, Camps went to the bathroom to check on plaintiff. Camps asked plaintiff if she was okay, and plaintiff responded from a stall, "not really." Camps asked plaintiff to come to the human-resources office when she was feeling better.

After Camps returned to the office to update Hughes and Lenzo, Hughes received a call notifying him that plaintiff was in the editing room. Camps, Lenzo and Hughes went to the editing room, where they found plaintiff sitting on a couch and crying. Lenzo asked plaintiff to come to her office, and plaintiff replied that she did not want to because it would "stress her out more." (Hughes Decl. [Docket #31-2] ¶ 19.) Lenzo repeated her request, and again plaintiff refused. Eventually, plaintiff left the editing room, but she did not come to Lenzo's office and did not explain why she had left her camera without permission on March 31. Lenzo presented plaintiff with a termination memorandum stating that plaintiff

was being terminated for leaving her camera without permission, and plaintiff left the building.

## II. DISCUSSION

The ADA prohibits employers form discriminating against qualified individuals on the basis of disability. 42 U.S.C. § 12112(a).[1] It also prohibits retaliation against a person for complaining about disability discrimination. 42 U.S.C. § 12203(a). In present case, plaintiff claims that Weigel violated the ADA by: (1) refusing to promote her to a full-time position or give her the training needed to become qualified for that position because of her anxiety disorder; (2) terminating her employment because of her anxiety disorder; and (3) terminating her employment as retaliation for complaining about disability discrimination. Defendant moves for summary judgment on a number of grounds: (1) plaintiff cannot establish that she had a disability or was regarded as having a disability; (2) plaintiff cannot establish that she was a "qualified individual with a disability"; (3) plaintiff cannot establish that she was terminated or not promoted because of her anxiety disorder; (4) plaintiff cannot establish that she engaged in any activity protected by the ADA that could form the basis of a retaliation claim; and (5) plaintiff cannot establish that she was terminated for engaging in any such protected activity.

I begin by determining whether the record allows a reasonable fact-finder to conclude that plaintiff had a disability. An individual may establish a disability in any one

---

[1] Significant changes to the ADA took effect on January 1, 2009. See ADA Amendments Act of 2008 ("ADAAA"), Pub.L. No. 110-325, 122 Stat. 3553 (2008). The actions that plaintiff challenges in the present suit occurred prior to January 1, 2009, and so the amendments made by the ADAAA do not apply to this case. See Serednyj v. Beverly Healthcare, LLC, 656 F.3d 540, 552 n.2 (7th Cir. 2011).

of three ways, by showing either (1) "a physical or mental impairment that substantially limits one or more of the major life activities of such individual," (2) "a record of such an impairment," or (3) "being regarded as having such an impairment." 42 U.S.C.A § 12102(2) (West 2008); Leisen v. City of Shelbyville, 153 F.3d 805, 807 (7th Cir. 1998). In the present case, plaintiff attempts to establish a disability by using the first and third ways.

As to the first way, plaintiff has failed to show that a reasonable fact-finder could conclude that her anxiety disorder substantially limited one or more of her major life activities. Indeed, plaintiff does not even attempt to identify any major life activity—such as walking, seeing, hearing or working—that was substantially limited as a result of her anxiety disorder. Although plaintiff asserts in her brief that she was "diagnosed with an anxiety disorder which affected her ability to engage in normal life activities" (Br. in Opp. [Docket #36] at 8), she does not identify any such normal life activities or attempt to show that her anxiety disorder "substantially limit[ed]" those activities. She states only that "her disorder caused her to become extremely anxious in times of stress to the point where she simply would shut down." (Id.)

Although it does appear that, once in a while, plaintiff would get so anxious that she would need to stop working and withdraw to the bathroom, this happened relatively infrequently—only four or five times over the course of the year she worked at Weigel. (Torres Dep. [Docket #31-1] at 217.) Moreover, except for the time plaintiff was hospitalized for one day, on those occasions when plaintiff's anxiety would affect her work, it did not cause her to miss an entire shift. (Id. at 220.) Thus, to the extent that plaintiff means to argue that her anxiety substantially limited the major life activity of working, her argument fails. See Cassimy v. Bd. of Educ. of Rockford Pub. Sch., 461 F.3d 932, 937

(7th Cir. 2006) ("Isolated bouts of depression . . . do not qualify as disabilities under the ADA."); Ogborn v. United Food & Commercial Workers Union, 305 F.3d 763, 767 (7th Cir. 2002) (mental impairment that causes inability to work for a short period of time does not substantially limit a person's ability to work). To be sure, plaintiff's anxiety seems to have impeded her ability to work as a production crew member in live television. But impeding one's ability to perform a specific job is not the same thing as substantially limiting one's general ability to work. See Cassimy, 461 F.3d at 936 (impairment that merely impedes ability to work does not substantially limit major life activity of working); Schneiker v. Fortis Ins. Co., 200 F.3d 1055, 1060 (7th Cir. 2000) (for impairment to substantially limit major life activity of working, it must "substantially limit employment generally," and not merely prevent the person from performing a specific job); Leisen, 153 F.3d at 808 (impairment does not substantially limit major life activity of working simply because it prevents a person from performing a particular job). Here, the record does not allow a reasonable fact-finder to conclude that plaintiff's anxiety substantially limited her general ability to work or substantially limited any other major life activity. Therefore, plaintiff cannot establish that she was disabled under the first of the three ways.

The next question is whether plaintiff can show that Weigel regarded her as having a disability. To succeed on a "regarded as" theory, a plaintiff must prove either that (1) the employer mistakenly believed that the plaintiff had an impairment that substantially limited a major life activity, or (2) the employer mistakenly believed that an existing impairment that was not really limiting did substantially limit a major life activity. Cassimy, 461 F.3d at 937.

In the present case, plaintiff had an impairment that was not really limiting, and so the question is whether Weigel mistakenly believed that this impairment substantially

9

limited a major life activity. Plaintiff does not attempt to identify any specific major life activity that Weigel might have thought was substantially limited. Instead, plaintiff points out that she informed Weigel that she had anxiety issues and told Hughes that she was hospitalized for one day for reasons related to her anxiety, that Camps regarded her as being "very unstable at times" and prone to "emotional outbursts," and that Hughes once told her that she would not receive training on the audio equipment because he did not want to "take her out of her comfort zone." Although these facts certainly show that plaintiff's supervisors at Weigel thought that plaintiff had anxiety issues and that they thought that these issues were negatively affecting her job performance, they do not allow a reasonable fact-finder to conclude that those supervisors mistakenly thought that plaintiff's anxiety substantially limited any major life activity. See id. (recognizing that awareness of an impairment is not the same thing as a belief that the impairment is substantially limiting). The strongest argument that plaintiff could make is that her supervisors mistakenly thought that her anxiety substantially limited her ability to work, but the evidence does not support that argument. As explained above, when an impairment affects only the performance of a particular job or only occasionally impedes a person's ability to work, the person's general ability to work has not been substantially limited. And plaintiff's evidence shows no more than that her supervisors thought that her anxiety occasionally interfered with her ability to perform the duties of a production crew member in live television. It does not allow a reasonable fact-finder to conclude that Weigel mistakenly believed that plaintiff's anxiety substantially limited her general ability to work or substantially limited any other major life activity. Therefore, plaintiff cannot establish that Weigel mistakenly regarded her as having a disability.

Because a reasonable fact-finder could not conclude that plaintiff had a disability within the meaning of the ADA, defendant's motion for summary judgment on plaintiff's disability discrimination claims will be granted. I therefore do not need to consider the remaining grounds that defendant raises in support of its motion for summary judgment on these claims.

As to plaintiff's retaliation claim, the threshold question is whether plaintiff ever complained about disability discrimination. If she did not, then of course Weigel could not have terminated her for complaining about disability discrimination. See, e.g., Squibb v. Mem'l Med. Ctr., 497 F.3d 775, 786 (7th Cir. 2007) (proving that plaintiff engaged in statutorily protected activity is element of ADA retaliation claim). Plaintiff argues that she complained about disability discrimination on two occasions shortly before her termination. First, on March 16, 2008, plaintiff left the voicemail message for Lenzo in which she complained about Hughes's having scheduled her to work only three shifts over the course of a two-week period. In that message, plaintiff described Hughes's actions as "discriminatory." Second, on March 17, 2008, plaintiff left another voicemail message for Lenzo about being scheduled for only three shifts. In this message, plaintiff stated that she believed that Hughes had discriminated against her by cutting her shifts and that she would "probably have to contact the Department of Workforce Development" if her hours weren't given back.

The problem for plaintiff is that in neither of these voicemail messages did she complain about discrimination on the basis of disability. Plaintiff did not mention her anxiety disorder or any other potential disability in these messages, and Lenzo could not have reasonably inferred from the surrounding context that plaintiff was complaining about

11

disability discrimination. Plaintiff never told Lenzo or anyone else at Weigel that she thought she was being treated unfavorably or unfairly because of her issues with anxiety, never told Lenzo or anyone else that she thought that Weigel had regarded her as being disabled, and never requested a reasonable accommodation of any real or perceived disability. Thus, Lenzo had no reason to interpret plaintiff's voicemail messages as complaints about disability discrimination. Of course, plaintiff informed Lenzo that she thought that Hughes was treating her less favorably than other employees and that she was being "singled out" for some reason, but she did not state or imply that that reason was related to her anxiety or any potential disability—or, for that matter, any other legally protected status, including race, sex or age.[2] When plaintiff mentioned the Department of Workforce Development, she was not stating that she intended to file a charge of discrimination; rather, she was stating that she intended to file a claim for partial unemployment benefits because Hughes had reduced her hours so drastically. (Torres Dep. [Docket #31-1] at 197–98.)

Accordingly, because no reasonable fact-finder could find that plaintiff complained about disability discrimination, defendant's motion for summary judgment on plaintiff's retaliation claim must be granted. I therefore do not need to consider the other grounds that defendant raises in support of its motion for summary judgment on this claim.

---

[2]According to defendant, in administrative proceedings before the Wisconsin Department of Workforce Development's Equal Rights Division, plaintiff claimed that she had been subjected to sexual harassment while working at Weigel. However, plaintiff has not raised a sexual harassment claim in the present suit, argued that she was terminated as retaliation for complaining about sexual harassment, or claimed that her reference to "discrimination" in the Lenzo voicemail messages related to sexual harassment or should have been understood as a complaint about sexual harassment.

## III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that defendant's motion for summary judgment is **GRANTED**. The Clerk of Court shall enter final judgment.

Dated at Milwaukee, Wisconsin, this 13th day of February 2012.

s/_____
LYNN ADELMAN
District Judge